OPINION
This matter presents a timely appeal of a jury verdict and judgment rendered by the Mahoning County Common Pleas Court in favor of defendants-appellees, St. Elizabeth Hospital Medical Center, et al.
On July 19, 1992, plaintiffs-appellants, Martin E. Jackson, et al. ("Mr. Jackson"), dove into his backyard swimming pool, striking his face on its bottom and sustaining a severe spinal cord injury, rendering him quadriplegic. Mr. Jackson was transported to St. Elizabeth Medical Center via ambulance where he came under the care of Dr. John Maxfield and other members of the hospital's trauma team, including four resident-physicians. Dr.Maxfield who is an agent and employee of Mahoning Valley Emergency Specialists, Inc. was the emergency room attending physician when Mr. Jackson was presented to the hospital. (John Maxfield, M.D., Tr. 9.).
The history of Mr. Jackson's chief complaint states, "[Patient] dove in pool head first[;] struck head on bottom. Unable to move arms and legs." (Appellants' Brief, Exhibit B). Moreover, the emergency room record indicates that Mr. Jackson was unable to surface on his own but that he was "oriented to time, oriented to place, oriented to person" and his pupils were "reactive, with conjugate gaze, without deviation to either side, [and] without nystagmus." (Appellants' Brief, Exhibit E). (Joint Trial Exhibit 1).
The record reflects that prior to his accident, Mr. Jackson consumed at least one can of beer. However, Mr. Jackson failed to recall the exact number of drinks that he had. (Martin Jackson Tr. 13-14). Mr. Jackson advised hospital personnel of his alcohol consumption, and the emergency department's trauma record indicated positive for ETOH (alcohol). Additionally, the laboratory reports identified Mr. Jackson's blood alcohol level as 0.130.
Mr. Jackson's treating physicians ordered various tests to assist them in evaluating the severity of his injury. A Glascow Coma Scale was performed to check Mr. Jackson's visual, motor, and verbal responses. This test indicated that Mr. Jackson was able to open his eyes spontaneously, was unable to move any extremity voluntarily, and did not verbally respond. Mr. Jackson underwent various radiological procedures, including chest and cervical spine x-rays, a myelogram, and a CT scan of his head and lungs. The cervical x-rays failed to reveal any fractures or dislocations but indicated positive for spinal stenosis (i.e., narrowing of the spinal cord). (Robert Zimmerman, M.D., Tr. 21-24).
Upon discharge from the emergency department, Mr. Jackson was admitted to the hospital and transferred to the surgical intensive care unit (SICU) where Dr. Shaukat Hayat, a neurosurgeon, examined and diagnosed him with complete quadriplegia. Dr. Chandler Kohli, Chief of Neurosurgery at St. Elizabeth Hospital, issued a second opinion of cervical spinal cord trauma with quadriplegia. Both doctors asserted that Mr. Jackson had permanent quadriplegia, in that his motor and sensory functions below the level of C3-C4 would never return. (Shaukat Hayat, M.D., Tr. 149-150; Chandler Kohli, M.D., Tr. 57-59). Drs. Hayat and Kohli were named as original defendants to this action; however, on April 10, 1997 said defendants settled the claim for the sum of $1,200,000.00 and were voluntarily dismissed from the case with prejudice. (Shaukat Hudak, M.D., Tr. 7).
Shortly after his admittance to the SICU, Mr. Jackson's respiratory condition began deteriorating, and he required the assistance of a respirator. Mr. Jackson's use of the respirator prevented him from undergoing a MRI due to the respiratory equipment's metallic nature. It was not until July 29, 1992, the day after his transfer to Allegheny General Hospital in Pittsburgh, Pennsylvania, that Mr. Jackson underwent an MRI. The MRI showed a soft disc herniation at the C3-C4 level which was compressing the thecal sac and the spinal cord at that level but failed to evidence spinal contusion, laceration, transection or swelling. (Robert Zimmerman, M.D., Tr. 50-55; Peter Jannetta, M.D., Tr. 39-40.). The discharge summary at Allegheny Hospital indicated that decompression surgery to remove the herniated disc was considered but could not be performed because of a delayed diagnosis. Mr. Jackson remained hospitalized at Allegheny Hospital until September 14, 1992. At that time, he was transferred to Greater Pittsburgh Rehabilitation Hospital where he remained until May of 1993. At the time, of this appeal, Mr Jackson was a quadriplegic and partially dependent on a respirator.
A key issue in this appeal is whether Mr. Jackson was able to push off the bottom of the pool after he struck his head. This issue is central to whether Mr. Jackson's injury was complete at the time he was presented to the hospital. That is, whether he experienced immediate quadriplegia. According to Dr. Peter Jannetta's testimony, whether the severity of Mr. Jackson's present condition could have been reduced depended on whether he had movement directly after impact (e.g., by pushing off the pool bottom). Dr. Jannetta indicated that had Mr. Jackson experienced some movement directly after impact, he would have had a better chance of improvement. (Peter Jannetta, M.D., Tr. 96-97, 133). Thus, Mr. Jackson's recollection was critical to his medical evaluation. Neither Mr. Jackson's medical records nor history indicated that Mr. Jackson was able to push off the pool bottom. However, at trial, Mr. Jackson testified that he recalled being able to push off the pool bottom with one leg. However, Mr. Jackson also testified that the impact knocked him "senseless." (Martin Jackson, Tr. 16, 52). Mr. Jackson's trial testimony conflicted with various reports documenting his accident and status upon presentation to the emergency department, and thus, raised the issue of his credibility.
On December 22, 1993, appellants filed a medical malpractice action in the Mahoning County Common Pleas Court, naming the following defendants: St. Elizabeth Hospital Medical Center; John Maxfield, M.D.; Mahoning Valley Emergency Specialists; Shaukat Hayat, M.D.; Alan Cropp, M.D.; Pulmonary Rehabilitation Associates; Chandler Kolhi, M.D.; Steven Aubel, M.D.; Asad Azarvan, M.D.; Lawrence Soges, M.D.; and Radiology Consultants, Inc.. Appellants alleged that appellees were jointly and severally liable to them for failing to properly diagnosis and treat Mr. Jackson's spinal cord injury, causing him irreparable damage. On January 27, 1995, Dr. Cropp and Pulmonary Rehabilitation Associates were voluntarily dismissed, as were Drs. Azarvan, Aubel and Soges, and Radiology Consultants, Inc. on January 4, 1996. On August 5, 1996, appellants filed an amended complaint, renaming Drs. Aubel and Soges and Radiology Consultants as defendants. The trial commenced on April 21, 1997, and the jury returned a verdict in favor of appellees upon which the trial court entered judgment on May 20, 1997. On June 17, 1997, appellants filed this appeal.
At the outset, the standard of review on appeal must be noted. Absent an abuse of discretion, a trial court's admission or exclusion of evidence must be affirmed. State v. Jells,
(1990), 53 Ohio St.3d 22, 30. "Abuse of discretion connotes more than an error of law or of judgment; it implies that the trial court's attitude is unreasonable, arbitrary or unconscionable."Tracy v. Merrell Dow Pharmaceuticals, Inc. (1991), 58 Ohio St.3d 147,152.
Appellants' sole assignment of error on appeal alleges:
 "The trial court committed prejudicial error by permitting appellees to introduce and admit evidence of appellant's alcohol consumption and blood alcohol level."
Appellants argue that the trial court should have excluded evidence of Mr. Jackson's alcohol consumption and blood alcohol level because that evidence was not relevant. Further, appellants contend that even if relevant, the evidence should have been excluded because its probative value was substantially outweighed by the danger of unfair prejudice, of confusion of the issues, and of misleading the jury.
In addressing appellants' sole assignment of error, we will review the issue of relevance first and then address whether the evidence, if relevant, was prejudicial.
Appellants contend that evidence of Mr. Jackson's alcohol consumption and blood alcohol level was not relevant, in that, it had no tendency to make the existence of the fact that Mr. Jackson was unable to accurately recall the events surrounding his accident more or less probable than it would have without such evidence. Appellants argue that the trial court committed prejudicial error by allowing appellees to introduce this evidence. Appellants posit that in the absence of this evidence, the jury would have rendered a verdict in their favor.
In support of their position, appellants point to specific reports by those who observed Mr. Jackson immediately after his accident. Appellants note that these reports fail to indicate that Mr. Jackson's alcohol consumption impaired his memory. For example, the Fireman's Report indicated that Mr. Jackson had possible spinal injuries, but did not suggest any evidence of alcohol use. The Ambulance Report identified that Mr. Jackson was unable to move his arms or legs but, like the Fireman's Report, did not comment on Mr. Jackson's alcohol consumption or his recollection of the accident. Also, the Emergency Department Trauma Flow Sheet did not suggest that Mr. Jackson had an impaired memory, and Dr. Maxfield's report noted that Mr. Jackson was "alert; oriented to time, oriented to place, oriented to person." (Appellants' Brief, Exhibit E). Furthermore, Dr Kelotra, a trauma team physician, indicated in her neurological evaluation summary of Mr. Jackson that he had told her that he had consumed alcohol prior to the accident yet was alert and oriented on arrival. She noted that Mr. Jackson's "higher functions like memory speech [were] intact." (Appellants' Brief, Exhibit G).
Additionally, appellants stress the testimony of two medical experts, both who testified that the value of Mr. Jackson's blood alcohol level, in and of itself, was not dispositive proof that his memory was impaired. Their opinions indicated only that his use of alcohol could have affected his memory, although they did not render an opinion as to whether it actually did.
Dr. Daniel Schelble, appellants' emergency medicine expert, testified as follows:
 Q* * * It's your testimony that a .13 blood alcohol level will not affect someone's recall abilities? That's what you're telling this jury under oath today; right?
"A: It may not.
 "Q: It may not. That's not what you said before. It can certainly?
"A: Pardon me?
"Q: It certainly is likely?
"A: It's possible.
"Q: It's likely?
 "A: No, it's not likely. It's not likely at all. All that tells is that it's above the level in the state of Ohio that you are considered to be capable of driving a motor vehicle without some impairment. That's what .10 or 100 milligrams per deciliter tells you. The fact that it's above .13 per individual case is meaningless. You have many people walking around the streets of Youngstown, I'm sure — I know we do in Akron — who have a normal blood alcohol of 250, 300. They appear, for all practical purposes, to be stone-cold sober.
"Q: Good, clear-thinking people, huh?
 "A: So you can't hang your — the picture here and start casting aspersions upon mental ability based solely upon a single blood alcohol level that is minimally elevated above state levels for impairment for the operation of a motor vehicle. That's meaningless." (Dr. Daniel T. Schelble, Tr. 190-91).
Furthermore, Dr. Peter Jannetta testified that alcohol consumption can affect one's memory; however, the degree of memory impairment varies depending on the amount of alcohol consumed. He testified:
 "Q: Okay. Doctor, in assessing Mr. Jackson's ability today to recall whether he had any function after the moment of impact, tell the jury whether or not you hold an opinion as to whether or not alcohol use can impact the patient's ability for recollection of events?
"A: Yes, it can.
 "Q: Do you know whether that's the case in this instance?
"A: No sir, I don't.
 "Q: Are you aware of what the blood alcohol value was in the laboratory finding upon the patient's presentation at St. Elizabeth Hospital?
"A: No, sir.
"Q: You did not?
 "A: I don't know what the blood alcohol level was. I can't recall.
"* * *
 "Q: Do you hold any opinions as to how high a value must be present before a patient's recollection would be substantially impaired?
 "A: Higher than driving while intoxicated. * * *" (Dr. Peter Jannetta, Tr. 133-34).
Appellants posit that the testimony of these experts, coupled with the lack of evidence supporting appellees' contention that Mr. Jackson had an impaired memory which impeded his ability to recall his accident, suggests that any evidence of Mr. Jackson's alcohol consumption and blood alcohol level was not relevant. As such, appellants contend that the trial court should have excluded the evidence.
The evidence of Mr. Jackson's alcohol consumption and blood alcohol level was relevant to his credibility and his ability to recall the events of his accident. Such evidence further had some tendency to make the fact that Mr. Jackson's memory was impaired more probable than without such evidence. Dr. Jannetta testified:
 "Q: You felt in January that the dividing line as to whether anything could be done for this man was the fact that he was able to push off. That suggested an incomplete injury, correct?
"A: Yes.
 "Q: And on that assumption — on that assumption surgery would be warranted?
"A: Considered. (Dr. Peter Jannetta, TR. 96-7)
"* * *
 "Q: So your understanding of his ability to push off the pool is based upon what his lawyer tells you?
"A: That's correct.
 "Q: Now, doctor, I have represented to this jury that that is a very important factor in your analysis of the medical issues in this case, and you would agree that that's true; would you not?
"A: That's an important factor.
 "Q: Because if the patient's quadriplegia was immediate, his prognosis would be much poorer than what you believe to be the case because of his ability to push off the bottom of the pool; correct?
"A: Yes, if that be true.
"* * *
 "Q: Well, Doctor, the fact is, you have just told the jury these are important facts for you to know in being able to render opinions to them; right?
"A: Yes.
"* * *
 "Q: One of the reasons that that is important is because due to the lack of immediate quadriplegia, you believe that that's a suggestion that he had a reversible lesion?
"A: Yes sir. Yes, sir.
 "Q: If he had been an immediate quadriplegia, your opinion on that issue may be quite different?
"A: Immediate total.
 "Q: Immediate total. From the — from the point of the lesion down.
 "A: Would mean less likely to improve." (Dr. Peter Jannetta, Tr. 131-33.)
Mr. Jackson noted in his testimony:
 "I pushed off with my leg * * * and I pushed off with my foot on the bottom of the pool cause I know that if I stayed down there I was going to drown, and I distinctly remember pushing off in order to alert the kids and the people in the pool to get help." (Martin Jackson, Tr. 17).
Mr. Jackson's testimony contradicts various reports documenting his accident, including his hospital records which failed to indicate that he was able to surface on his own. Moreover, Mr. Jackson's recollection of the time of the accident differed significantly from the time indicated in the Ambulance Report. In addition, Mr. Jackson's wife, Gloria Jackson, stated that she was unaware of her husband's ability to push off of the pool bottom until shortly after she mentioned her intent to contact an attorney.
Mr. Jackson's ability to push off the pool bottom was critical to his care, and thus, his credibility (i.e., his ability to accurately recall the events of his accident) became an important issue. Accordingly, evidence of his alcohol consumption and blood alcohol level was relevant to that issue and properly admitted.
Evid.R. 402 provides that "[a]ll relevant evidence is admissible, * * * Evidence which is not relevant is not admissible." Evid.R. 401 proceeds to define relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 611(B) provides that cross examination "shall be permitted on all relevant matters and matters affecting credibility." The Ohio Supreme Court has taken judicial notice that "the more alcohol one consumes, the more likely it is that he or she is impaired by alcohol intoxication." Cabe v. Lunich
(1994), 70 Ohio St.3d 598, 602.
In Kenney v. Fealko (1991), 75 Ohio App.3d 47, the court of appeals upheld the trial court's decision to admit evidence of appellant's intoxication at the time of the traffic accident at issue in order to test her credibility. Appellant, Edna Kenney, appealed a jury verdict and judgment rendered against her on the issue of negligence. Appellant moved for a judgment notwithstanding the verdict or for a new trial. Appellant argued that the trial court erred in admitting evidence of plaintiff-appellant's blood alcohol level when she neither operated the motor vehicle nor testified as to the facts of the accident. Appellant argued that such evidence was not relevant and should have been excluded.
The court of appeals noted that appellant's credibility as a reliable witness was at issue, as she testified with respect to her own physical condition and to her husband's driving abilities. Kenney, supra. The court of appeals held that a witness's credibility may be attacked through evidence of the witness's intoxication at the time of the matter in question. The court stated that "[s]uch evidence is relevant to the issue of credibility, since it questions the ability of the witness to correctly perceive the events which allegedly occurred." Kenney,supra at 51.
In the alternative, appellant asserted that even if relevant, the trial court should have excluded the evidence because its probative value was substantially outweighed by the possibility of unfair prejudice and confusion of the issues. The court of appeals found that the trial court did not abuse its discretion in admitting the evidence because it gave the jury a limiting instruction which specifically stated that the jury could only consider the evidence with respect to the issue of credibility and not the issue of causation. Kenney, supra.
Similarly, in Klever v. City of Stow (Feb. 24, 1982), Summitt App. No. CA-10223, unreported, the court of appeals reversed the trial court's decision to grant a pre-trial motion in limine which prohibited appellants from introducing evidence of appellees' alcohol and/or drug use prior to the accident at issue. The court of appeals found that such evidence was relevant and should not have been excluded. The appellate court reasoned, "[t]he use of alcohol or drugs might affect their ability to gain just impressions from the facts as the events happened, their ability to recollect them with reliability and their subsequent ability to recall them with accuracy and testify about them reliably." Klever, supra at 1.
The trial court did not err in admitting evidence of Mr. Jackson's alcohol consumption and blood alcohol level. Pursuant to Evid.R. 401 and 402, the evidence of Mr. Jackson's alcohol consumption and blood alcohol level was relevant and admissible. That evidence had some tendency to make the fact that Mr. Jackson was unable to recall accurately the events of his accident more probable than without the evidence. As in Kenney, supra, wherein the appellate court allowed evidence of an automobile passenger's blood alcohol as relevant to the issue of her credibility as a witness, we find that evidence of Mr. Jackson's alcohol consumption and blood alcohol level was imperative to resolving the issue of his credibility. Moreover, we agree with the court in Klever, supra that "[t]he use of alcohol or drugs might affect [one's] ability to gain just impressions from the facts as the events happened, [one's] ability to recollect them with reliability and [one's] subsequent ability to recall them with accuracy and testify about them reliably."
Furthermore, the testimonies of Drs. Jannetta and Scheble do not conclusively establish whether Mr. Jackson's consumption of alcohol affected his recollection. The doctors do not opine as to that fact. Instead, they assert only that alcohol may impair one's memory, depending on the amount consumed. Their testimonies leave open the possibility that Mr. Jackson's alcohol use may have impaired his ability to recall the events of his accident, thus, calling into question his credibility. Evidence of his alcohol consumption and blood alcohol level would tend to make that fact more or less probable than without such evidence, and accordingly, the trial court found the evidence relevant and admitted it without error.
Secondly, appellants argue that even if the evidence of Mr. Jackson's alcohol consumption and blood alcohol level was relevant, the trial court should have excluded that evidence because its probative value was substantially outweighed by the danger of unfair prejudice, of confusion of the issues, and of misleading the jury. Appellants argue that by allowing appellees to introduce evidence of Mr. Jackson's alcohol consumption and blood alcohol level, the trial court allowed the jury to infer that Mr. Jackson caused his own injuries. Appellants suggest that the trial court's limiting instruction concerning this evidence was not enough to combat the outright prejudicial effect of such evidence. Furthermore, appellants contend that the trial court should have excluded evidence of Mr. Jackson's alcohol consumption and blood alcohol level because appellees failed to provide expert testimony to establish and explain its significance. Appellants posit that people will generally assume that a person with a blood alcohol level above the legally prescribed limit to operate a motor vehicle is legally intoxicated per se. Appellants argue that the difference between the two legal standards should have been properly explained to the jury, so as not to mislead them. The failure to explain these standards, they argue, was highly prejudicial to their case.
The limiting instruction given to the jury protected appellants, in that, it prevented the jury from being prejudiced by disallowing the consideration of alcohol consumption as a basis for establishing causation. Appellants waived their assignment of error by failing to object to the introduction of evidence on Mr. Jackson's alcohol consumption and blood alcohol. The trial court could not exclude evidence which appellants failed to object to at trial and which appellants, themselves, introduced. Accordingly, the trial court properly admitted this evidence.
Evid.R. 403(A) mandates that even if relevant, "evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." A jury is presumed to follow the instructions of a trial court. State v. Henderson (1988),39 Ohio St.3d 24, 33.
Prior to the voir dire examination, the trial court issued a ruling regarding the introduction of alcohol evidence. The trial court noted:
 "[T]he Court does believe that evidence of intoxication of a witness at the time of the matter about which he testifies is relevant on the issue of credibility of his testimony on that matter and that, therefore, counsel will be permitted to cross-examine the plaintiff and/or his family relative to that matter." (Pre-trial Discussion, Motion and Instructions Regarding Alcohol, 28-9).
Accordingly, the trial court presented to the jury a limiting instruction both before the trial and during closing instructions. The trial court stated:
 "The court instructs you that it is not a defense to this case that Martin Jackson consumed alcohol prior to the accident. The fact should not be considered as to whether or not the defendants were negligent in their care of Martin Jackson. The court instructs you that the issue of alcohol consumption or intoxication may only be considered by you, if at all, with regard to Martin Jackson's credibility and his ability to know the things about which he testified." (Pre-Trial Discussions, Motion and Instruction Regarding Alcohol, 33)
In Kenney, supra, the appellate court found that the probative value of the alcohol evidence was not substantially outweighed by unfair prejudice or confusion of the issues. The appellate court focused on the limiting instruction which the trial court presented to the jury. The appellate court stated at page 51:
 "As to this point, this court would note that the trial court emphatically instructed the jury that the evidence concerning appellant's state of intoxication could only be considered as it related to the issue of credibility. The court also stated that it could not be considered in relation to the issue of causation. Thus, the court sought to limit the possibility of prejudice or confusion. Under these circumstances, the court did not abuse its discretion in allowing the introduction of the relevant evidence."
The introduction of intoxication evidence had a probative value which substantially outweighed its prejudicial effect. This conclusion is arrived at by utilizing a balancing test.
Appellees introduced evidence of Mr. Jackson's alcohol consumption and blood alcohol level to attack his credibility as a witness. Appellees used the evidence to show that a statement which Mr. Jackson had made at one point differed from his later testimony. Realizing the purpose of the evidence, the trial court stated:
 "From everything that I have heard here this afternoon, I absolutely believe that counsel for the defendants with their ability and with their witnesses, both factual and experts, can address any issue relative to the intoxication and the scores presented through the emergency room and any cross examination of the plaintiff and/or his family. My ruling is going to stand." (Pre-Trial Discussions, Motions and Instructions Regarding Alcohol, 22-3)
The trial court proceeded to instruct the jury as discussed above. Therefore, every precaution was taken to avoid prejudicing appellants' case. Appellees used the intoxication evidence in a strictly limited capacity, introducing it for the sole purpose of credibility and for no other purpose than that which the trial court instructed. Furthermore, appellees did not emphasize the evidence at trial, as they expended merely fifteen minutes of the month-long trial discussing it.
Balancing the probative value of the alcohol evidence against its prejudicial effects, this court finds that the probative value substantially outweighed the prejudicial effect of the evidence. Accordingly, the trial court did not abuse its discretion in admitting the evidence.
Furthermore, the trial court could not sua sponte
exclude evidence of Mr. Jackson's alcohol consumption and blood alcohol level because appellants did not object to that evidence at trial. Appellants made a continuing objection to the introduction of intoxication evidence at the pretrial discussions regarding alcohol. However, the transcript from that hearing reflects appellants' objection to the court instructions on alcohol and not to the introduction of alcohol evidence. The transcript stated:
 "THE COURT: * * * Have you had the opportunity to review the instructions proposed by the Court; one instruction relative to Drs. Hayat and Kohli, the other instruction relative to alcohol?
"* * *
 "MR. GOLDBERG: Your Honor, I have no problem with the alcohol intoxication other than, as I said before, I don't think it should be mentioned, and I want to preserve my —
"THE COURT: Understood.
 "MR.GOLDBERG: — comments in that respect." (Pre-Trial Discussions, Motion and Instruction Regarding Alcohol, 30-1).
Even if an objection had been raised, it was premature because evidence of alcohol had yet to be introduced. Appellants' counsel made a statement merely on the instruction to be given concerning the introduction of such evidence and not on the evidence itself.
The denial of a motion in limine does not preserve an issue for review on appeal. Gosden v. Louis, 116 Ohio App.3d 195
(1996). "A pretrial ruling on such a motion is a preliminary precautionary ruling by a court in anticipation of its ruling on evidentiary issues at trial." Meszar v. Bowen Implement Company,
(1997), 122 Ohio App.3d 141 (quoting State v. Grubb (1986),28 Ohio St.3d 199, 201-02). A party must object to an error at trial to preserve such error for review. Gosden, supra.
In Gosden, supra, the plaintiffs raised a motion inlimine during pretrial, asking the court to preclude the defense from introducing evidence of plaintiff Ian Gosden's prior conviction. The court denied the motion. On direct examination at trial, plaintiffs' counsel questioned Gosden about his conviction. On appeal, plaintiffs argued that evidence of Gosden's conviction was inadmissible because the record of that conviction had been sealed. The court found that plaintiffs had invited the error by first offering the evidence at trial, and that they could not complain on appeal about an error which they induced at trial. Gosden, supra at 214. The court stated:
 "Once plaintiffs' motion in limine was denied, they were presented with a strategic decision. They could wait until defendants attempted to introduce evidence of Gosden's conviction, object to it, and if the trial court overruled their objection, preserve their argument on appeal. Alternatively, they could introduce the conviction themselves in an effort to minimize its effect. Having chosen to introduce it themselves, they cannot complain to this court because the trial court received it." Gosden, supra at 215.
The scenario in Gosden is similar to what developed in the case sub judice. Appellants made a motion in limine which was denied. At trial, appellants made a strategic decision to introduce the alcohol evidence themselves, rather than to object to the evidence if appellees introduced it. Appellants cannot now complain to this court that the trial court erred by admitting the evidence.
Appellants' sole assignment of error is found to be without merit.
Appellee, St. Elizabeth Hospital Medical Center, raises an additional cross assignment of error for this court's consideration, which alleges:
 "The trial court erred by not granting defendant-appellee St. Elizabeth Hospital Medical Center's motion for a directed verdict as to the claim made against it with respect to its liability for the alleged negligence of Dr. Shaukat Hayat, M.D., who settled with plaintiffs-appellants and was released from any liability prior to trial, because once the party primarily responsible is released, there can be no liability as against the party secondarily responsible."
Appellee argues that the action against it for liability for the negligence of Dr. Hayat should have been dismissed once Dr. Hayat settled with appellants and was released from liability. Appellee contends that this claim was based on the doctrine of respondeat superior and that appellants asserted no direct liability on its part.
Given our discussion and decision under appellants' sole assignment of error on appeal, we find it unnecessary to address appellee's argument under their cross assignment as same is moot.
The judgment of the trial court is hereby affirmed.
Donofrio, J., concurs.
Vukovich, J., concurs in part and dissents in part. See concurring in part and dissenting in part opinion.
APPROVED:
 __________________________________ EDWARD A. COX, PRESIDING JUDGE